ALEXANDER M. YOUNG *et al.*

*v.*

TIMOTHY BRADLEY *et al.*

1. SALE—*when title passes so as to protect a subsequent bona fide purchaser from the original vendee.* The rule is well settled in this State, that a delivery of personal property under a contract of sale by an unpaid vendor to the vendee, passes the title so far that an innocent purchaser from the latter will be protected, irrespective of the contract or the intention of the parties.

2. SAME—*what amounts to delivery to enable vendee to pass a good title.* Where a party sold a lot of pork, to be paid for on delivery, and had the same taken to the railroad depot for shipment to the purchaser, and upon refusal of the purchaser to accept and pay for the same, took no steps to prevent a delivery to the purchaser from the railroad company, which might have been done before delivery at the place of destination, the vendor knowing or having reason to know that the same was way-billed to the purchaser, and the latter, having received the pork from the railroad company, stored the same, taking warehouse receipts therefor, which he afterwards sold to innocent purchasers in the usual course of trade: *Held*, that the facts amounted to a delivery as in favor of the purchasers of the original vendee, and that they acquired a valid title as against the original vendor.

APPEAL from the Superior Court of Cook county; the Hon. WILLIAM A. PORTER, Judge, presiding.

This was an action of replevin, brought by Alexander M. Young, William Young and Ransom W. Dunham, partners, against Timothy Bradley, Alexander Thorne, John R. Thorne and Josiah L. Keck, to recover possession of a lot of mess pork which the plaintiffs claimed as their property.

The facts in regard to the sale, shipment and delivery of the pork by Keck to J. Brooks Johnson are fully stated in the opinion. Johnson received the pork from the railroad company and stored the same with Thorne & Co., taking negotiable warehouse receipts. While so stored, Keck replevied the pork from Thorne & Co. and Johnson, and while the same, was in the custody of the sheriff, Bradley, Young & Co., the appellants, who had purchased the pork and paid for the same, in the regular course of business, without any notice of any adverse claim thereto, and to whom were indorsed and delivered the warehouse receipts issued to Johnson, replevied this pork from the sheriff, making Thorne & Co. and Keck co-defendants in the suit.

The cause was tried before the court without a jury, and the issues found for the defendants below, and judgment entered accordingly. To reverse this judgment the plaintiffs bring the case to this court by appeal.

Messrs. MONROE, BISBEE & GIBBS, and Mr. M. W. FULLER, for the appellants.

Mr. E. WALKER, and Messrs. MATTHEWS, RAMSEY & MATTHEWS, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

This was an action of replevin, brought against the defendants, to recover possession of a quantity of mess pork, claimed by the plaintiffs as their property.

On July 26, 1872, J. L. Keck, of Cincinnati, entered into a contract with J. Brooks Johnson & Co., of Chicago, of which the following is a copy:

"Bought of J. L. Keck, of Cincinnati, Ohio, two thousand barrels of mess pork, to be either 'McKean & Evans,' 'Samuel Davis, Jr.,' 'Joseph Ransom & Sons,' or 'R. Beresford & Co.' brands of Cincinnati, date of packing and number of pieces to be branded on the head of each barrel with stencil or branding iron; pork to be delivered on cars at Cincinnati, Ohio, in good merchantable shipping order, for which we agree to pay (13¾) thirteen and three-quarter dollars per barrel at Cincinnati, Ohio.

　　　　　　　　　　"J. Brooks Johnson & Co.

　　　　　　　　　　"J. L. Keck."

"Chicago, July 26, 1872."

"The above contract guaranteed by us on behalf of J. Brooks Johnson & Co.

　　　　　　　　　　"E. L. & T. S. Johnson."

Keck subsequently caused the pork to be hauled to the depot of the Cincinnati, Hamilton and Dayton Railroad Co., at Cincinnati, and delivered to the railroad company. The railroad company issued its receipts for the pork as delivered, in the ordinary form known as "dray tickets." The first deliveries were made to the railroad company August 8th, 1872, and the last on Saturday, August 10th, 1872, the receipts being in the following form:

"Received of McKean & Evans, at the Cincinnati, Hamilton and Dayton railroad depot, the following articles, in good order, to be forwarded, *via* Richmond, to Chicago. Articles: 31 barrels mess pork; 32 barrels mess pork. Marks: R. Beresford & Co., packers."

On that day, Saturday, an account of the purchase money of the pork at the contract price was presented to J. Brooks Johnson, in Cincinnati, and payment demanded, the railroad receipts being at the same time tendered. Payment was

refused, Johnson claiming that the number of pieces was not correctly branded on the barrels, and requiring a guaranty that the numbers would count out right in Chicago, which was refused.

On Monday, August 12, at noon, the dray tickets were presented to the agent of the railroad company by the agents of Keck, and the name of B. F. Murphy & Co. was inserted as consignees, in the dray tickets, the tickets surrendered to the railroad agent, and bills of lading were issued to Keck, with B. F. Murphy & Co. designated as consignees. Meantime, the pork had been going forward to Chicago. A portion of it arrived there on Saturday, the 10th of August, and the remainder of it between Saturday night and Monday morning, August 12, and it all came consigned or way-billed to J. Brooks Johnson. The freight agent at Chicago sent word to the place of business of J. Brooks Johnson & Co. of the arrival of the pork, and inquiring what should be done with it, and in accordance with their instructions, given on Monday morning, August 12, the pork was on that day delivered at the warehouse of Thorne & Co., in Chicago, and the latter issued their warehouse receipts therefor to J. Brooks Johnson & Co., which were subsequently indorsed by them, and were received in the regular course of business by Young & Co., the plaintiffs, upon purchases made by them of several lots of the pork in question of several different parties. No question is made that, upon the evidence, the plaintiffs were *bona fide* and innocent purchasers of the pork for a fair consideration, in the ordinary course of business, without notice of any adverse claim.

Johnson procured Thorne & Co. to repack the pork and rebrand the number of pieces in each barrel upon it. This had been done, and regular inspection certificates accompanied the warehouse receipts, when plaintiffs bought the pork. After the purchase by the plaintiffs, and while the pork was so stored in the warehouse of Thorne & Co., Keck replevied the pork from Thorne & Co. and Johnson, and the plaintiffs

brought this action of replevin for the pork against the sheriff, making Thorne & Co. and Keck co-defendants. Judgment was rendered for the defendants in the court below, and the plaintiffs bring this appeal to reverse the judgment.

The question made upon the record is, whether a right of property was shown in the plaintiffs.

There is no controversy as to the facts. The question is only upon the force and effect of the facts. Do they amount to a delivery under the contract of sale, so as to bring the case within the well settled rule, as held by this court, that a delivery of personal property under a contract of sale by an unpaid vendor to the vendee passes title, so far that an innocent purchaser will be protected, irrespective of the particular terms of the contract or of the intention of the parties? *Jennings* v. *Gage,* 13 Ill. 610; *Brundage* v. *Camp,* 21 id. 330; *M. C. R. R. Co.* v. *Phillips et al.* 60 id. 190.

The pork was actually shipped to J. Brooks Johnson & Co., at Chicago. It was receipted for by the railroad company as to be forwarded to Chicago. The dray tickets given by the company were without any name of consignee. And this appears to have been the custom of shippers when they wished to hold the property to their own order until the dray tickets should be returned and bills of lading given with the name of consignee. Kleck, Porter, who had some agency in the matter, Cunningham and Beresford, who had an interest in the pork, all deny that they gave any instructions in reference to the shipment of the pork to J. Brooks Johnson & Co., or knew of its being so shipped. There is no explanation whatever of the fact, how the pork came to be shipped in the name of J. Brooks Johnson & Co. There were ten persons who had an interest in the pork. The presumption is very strong that it must have been way-billed as it was by the express or implied direction of the owners, or of some of them, or of some one having control of the property under them. The well known mode of business would hardly admit that it should have been otherwise. But whether the denial stated

above, and the circumstance of the absence of the name of a consignee in the dray tickets, were sufficient to overcome the above presumption, in the absence of any evidence that the shipment, as made, was through mistake, or by means of any fraudulent contrivance, we deem it unnecessary to consider, in view of another piece of evidence.

Cunningham, who was a partner of Keck, and had an interest in the pork, testifies that, on Saturday afternoon, on demand of payment from J. Brooks Johnson, in Cincinnati, at the office of E. L. & T. S. Johnson, they said they wished to look at the pork; whereupon they all went to the depot, and Cunningham pointed out about 80 or 100 barrels of pork which were lying upon the floor, and the Johnsons wished to know where the balance was. Cunningham told them he supposed it was shipped, on its way to Chicago. They inquired who ordered it shipped to Chicago; he replied he believed E. L. Johnson had ordered it. Another demand of payment was then made of J. Brooks Johnson, and he declined or refused payment. Cunningham then told E. L. & T. S. Johnson, the guarantors, that he would have to look to them for the money. The latter said they were relieved, as the purchaser was there and declined to receive the pork.

Here is evidence that, at that time, Cunningham knew of the shipment of the pork. He must have known that it was shipped to some person. To whom else could he reasonably suppose it was shipped, than to J. Brooks Johnson? If he did not then know such to be the fact, at least his suspicion should have been aroused that it was so, and there was enough to have put him upon inquiry, and caused him to ascertain that it was so shipped—as he might have done at once, and upon the spot, being then at the depot—and he should have taken speedy means to prevent the delivery to Johnson. Regard for the interest of innocent purchasers, who might be misled by Johnson being thus held out to the world as the owner of the property, required this. Had this been done, a telegram, or probably a letter, sent to Chicago

on Saturday afternoon, would have arrested the delivery of the pork to Johnson. But no step whatever was taken toward that end until Monday noon, when the dray tickets were presented to the freight agent of the railroad, at Cincinnati, and bills of lading obtained with the name of "B. F. Murphy & Co., Chicago," inserted as consignees, and on Tuesday morning about 8 o'clock, when it was too late, the freight agent at Chicago received a letter and two telegrams from Cincinnati, saying that the pork should have been consigned to B. F. Murphy & Co.

There was an expectation, no doubt, that payment would be made at the time of the delivery on the cars; but the conduct of the owners of the pork would seem to indicate that, for security for the payment, they relied rather upon the guaranty than upon the retention of the possession of the property.

By way of excuse for this negligent conduct of the owners, it is said that, after the occurrence with Johnson, and his refusal of payment, they had the right to assume that he would not attempt to obtain possession of the pork. There is no pretence that there was, in consequence of such refusal, any rescinding of the contract of sale. It does not depend upon what the owners had reason to assume that Johnson would or would not do, but upon what he had the power to do. As well might it have been urged in the cases cited above that the vendors had a right to rely upon the express promise and good faith of the vendees, and to believe that they would not act in violation thereof, and dispose of the property intrusted to their possession, and defeat the vendor's claim for payment of the purchase price. By suffering the pork to go forward consigned or way-billed as it was, it came into the hands of Johnson, the vendee, with the *indicium* of ownership in him, and he was thereby enabled, as the apparent rightful owner, to sell and dispose of the property. It is this which the original owners of the pork are answerable for, as respects innocent purchasers, without regard to the

fact that they had reason to believe that Johnson would not misuse the power with which he became invested.

Under the facts of this case, we must consider that on Saturday afternoon the original owners of this pork either actually did know, or were bound to know, that it had gone forward to Chicago consigned or way-billed to Johnson, the vendee. In neglecting, as they did, to take earlier means to stop the delivery to him, which might have been taken with effect, we are of opinion that they must be regarded as having suffered the property to go into the actual possession of Johnson and under his control, under circumstances which enabled him to impose himself on the world as the real owner. We must view it in the light that Johnson got the possession by what may be regarded as amounting to the assent of the vendors, and that their conduct in relation to the property should be deemed tantamount, in effect, to an actual delivery of it to the vendee, so far as the rights of innocent purchasers are concerned.

The judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*