THIRD NATIONAL BANK, Appellant, v. SMITH et al., Respondents.

St. Louis Court of Appeals, May 10, 1904.

1. **SALES: Delivery: Bill of Lading.** The delivery of goods to a common carrier for transportation to the vendee, in accordance with his instructions, is a delivery to the carrier as the vendee's agent and equivalent to a delivery to the vendee himself.

2. ——: ——: ——. Commission merchants sold a carload of corn "for cash," to be paid for when its weight could be

ascertained from the railroad company over whose line the grain was to be shipped, which could not be done for several days. They gave up the bill of lading to the railroad company, on whose line the car stood when the sale took place, and directed the agent of that company to send the car to a certain carrier for transportation. By order of the purchaser, it was loaded into the car of a carrier, other than the one designated, and consigned to parties in a distant city, to whom the purchaser had sold it. The purchaser, at the time, procured a bill of lading, attached it to a draft on his consignee and discounted the draft at a bank. The purchaser from the commission merchants failed to pay for the corn and it was attached by the purchaser's several creditors. The commission merchants replevined the corn from the sheriff who held it under the attachments, sold it and converted the proceeds. *Held,* the bank, assignee of the bill of lading, in an action for conversion against the commission merchants, could recover the value of the corn: Title passed to the purchaser on delivery to the carrier by the order of the seller, and sending the car to a carrier other than the one directed by the commission merchants, did not affect the actual delivery to the purchaser.

3. ———: ———: **Cash Sale.** The sale was not "for cash," and the fact that the corn had to be weighed to find the total price did not postpone the transfer of title or render the sale executory.

4. ———: ———: **Estoppel.** The commission merchants, having made it possible for the purchaser to deal with the corn as an apparent owner, were estopped to claim it as against the assignee of the bill of lading from the purchaser.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

Action for conversion. Judgment in trial court in favor of defendant.

REVERSED AND REMANDED.

*Johnson; Houts, Marlatt & Hawes* for appellant.

(1) Where the specific property to be transferred is ascertained and the terms of the transaction indicate a present sale, and not a mere agreement to sell, the title to the property vests in the vendee, and a bona fide purchaser from such vendee will be protected in his

title. Glass v. Blazer Bros., 91 Mo. App. 264; Grocer Co. v. Clements, 69 Mo. App. 446; Southwestern, etc., Co. v. Stanard, 44 Mo. 83; Lingham v. Eggleston, 27 Mich. 329; Lbr. Co. v. Charlton, 55 L. R. A. 301. (2) Delivery of the property to the vendee in pursuance of the contract of sale is very strong, and almost conclusive, evidence of an intent to transfer the title. Judge Cooley's opinion in Lingham v. Eggleston, 27 Mich. 329. (3) Where the terms of sale are "cash on delivery" and the seller delivers the goods to the purchaser without demanding payment, the seller thereby waives cash payment, and as against a bona fide purchaser from the vendee, title vests in such vendee. Benjamin on Sales, p. 282 (American note); 24 Am. & Eng. Ency. of Law (2 Ed.), 1165-1166; Depew v. Robards, 17 Mo. 580; Cramer v. Groseclose, 53 Mo. App. 648; Cold Storage Co. v. Bank, 176 Ill. 260; Railroad v. Phillips, 60 Ill. 190; Young v. Bradley, 68 Ill. 553; Johnson-Brinkman Co. v. Bank, 116 Mo. 572; Scharff v. Meyer, 133 Mo. 446. (4) The delivery of the goods by the seller to a common carrier selected by the purchaser, to be by it transported and delivered to the purchaser, constitutes a delivery to the purchaser. This is particularly true where the consignor takes no steps to preserve the *jus disponendi*. Gill & Fisher v. Johnson-Brinkman Com. Co., 84 Mo. App. 546.

*Wm. A. Kinnerk* for respondents.

### STATEMENT.

Appellant seeks to recover the value of a carload of corn alleged to have been converted by the respondent November 14, 1900, when it was the property of the appellant. Respondents were commission merchants doing business on the floor of the Merchant's Exchange in the city of St. Louis. The corn was sold by them August 23, 1900, to the Woodson-Young Grain Company, a corporation. The transaction occurred on the floor of the exchange and was conducted by J. F. Vincent,

one of the respondents, and Edward H. Young, president of the grain company. These parties had had transactions in grain before and a difference had arisen and was then existing between them in regard to a previous sale of corn. The difference was due to the delay of the Woodson-Young Grain Company in furnishing the weight of a car of corn to the respondents so that the transaction could be closed by payment of the purchase price. The evidence discloses that when a sale of grain took place, the price of the grain was paid by the purchaser, the Woodson-Young Grain Company, to the respondents after its weight was ascertained and communicated to the respondents. The weights of the different shipments were usually obtained from the Columbia Elevator Company, an establishment in East St. Louis controlled by E. H. Young, or from the railroad company over whose line the grain was to be shipped to the parties to whom the Woodson-Young Grain Company sold it after the purchase from the respondent. The car of corn in question was on the track of the "K" Line (a connection of the Chicago, Burlington & Quincy Railroad Company) in St. Louis when the sale to the Woodson-Young Grain Company occurred. The latter company purchased for shipment to J. H. Wilkes & Co., Nashville, Tennessee, to whom it had been sold. At the time of the transaction, E. H. Young directed Vincent to send the car of corn to the Louisville & Nashville Railroad Company in East St. Louis by way of the Columbia Elevator. Accordingly Vincent wrote this direction to the agent of the "K" Line:

"St. Louis, 8—23, 1900.

"Mr. Elting,
    "Agent 'K' Line:
"Please send car No. 10811, initial B. & M., containing corn, to L. & N. R. R., E. St. Louis, via the Columbia Elevator for transfer via Wiggins Ferry.

"For account Woodson-Young Grain Company.
(Signed.)           "SMITH, VINCENT & Co.,
                              "Per VINCENT.
"Received bill of lading 10811.
"By A. Hamilton for H. E."

At the time this order was given respondents surrendered the bill of lading for the corn, which had been issued to them by the railroad company on whose track it stood, and in obedience to the order said railroad company (the "K" Line) marked the car for transportation by the Wiggins Ferry Company via the Columbia Elevator, there to be weighed and transferred to the Louisville & Nashville Railroad Company. When it reached the elevator on August 27, it was weighed, but instead of being loaded into a car of the L. & N. Railroad, by order of Young it was loaded into a car of the Illinois Central Railroad Company, consigned to the intended consignee, J. H. Wilkes & Co., Nashville, Tenn. On August 29, the weight of the grain was reported to the respondents who demanded payment, but failed to obtain it. On the same day the respondents found the corn in the Illinois Central car ready for shipment to Nashville and attached it as the property of the Woodson-Young Grain Company. Other creditors of the grain company also attached it. While the corn was in the hands of the sheriff under the attachment writs, the respondents, on November 14, instituted an action of replevin against the sheriff to recover possession of the corn, sold it and appropriated the proceeds. The attachment suit was dismissed November 27. When the Woodson-Young Grain Company transferred the corn to the Illinois Central car for shipment to Nashville, it procured a bill of lading from the Illinois Central Railroad Company, acknowledging receipt of the grain from the Woodson-Young Grain Company consigned to J. H. Wilkes & Co., at Nashville, Tenn. The grain company then drew a draft on J. H. Wilkes & Co. for $418.70, the

price of the corn, attached it to the bill of lading and discounted it with the appellant bank on August 27, 1900, indorsing the draft and bill of lading to the appellant. By virtue of the assignment of the bill of lading the appellant claims to have become the owner of the corn on the date of the assignment, August 27, 1900; and after the recovery of it by the respondents in the replevin suit, the sale and the conversion of the proceeds, appellant brought this action for its value, alleging that respondents took those steps knowing it was appellant's property.

J. F. Vincent, one of the respondents, testified as follows:

"Q. Please state all the facts and circumstances in connection with that sale? A. Well, I had a car of corn for sale on the floor of the exchange, and Mr. Young came up and asked me the price of it and I told him, and I immediately asked about the weights on another car that had been— And after giving him the price, immediately took up the matter with him about weights on a car I had sold him some ten or twelve days previously, upon which I had been trying to secure weights almost daily for about six or eight days, and had been unable to secure any weights from Mr. Young or his office force, on account of his alleging that his elevator machinery was broken down, in consequence of which his elevator was not running. After his assurance that the shaft of his elevator would be repaired within the next forty-eight hours, so he would be running and weights could be given us on the previous car with no further delay on any more—returning the weights on any more grain—I finally sold him a second car on the twenty-third of August, that being car 10811 B. & M.

"Q. On the floor of the Merchant's Exchange? A. Yes, sir.

"Q. Where was that car to be delivered? A. I

sold it to be delivered to the L. & N. Railroad at East St. Louis.

"Q. How did you come to sell it in that way—I mean did he or did he not ask you to bill the car in that way? A. Yes, sir; he did; after he had purchased it he gave me instructions how to bill it. He purchased it in the first place delivered on the L. & N. East St. Louis, and after purchasing it gave me instructions to bill it by this elevator for weighing, via the Wiggins Ferry Company.

"Q. What was the custom, Mr. Vincent, about the payment among grain men on 'Change for goods sold? A. The custom is that unless there is some special arrangement, the general custom is to pay for the grain and it is sold for the cash; but the general custom is that it is paid for immediately after the actual weight of the grain can be ascertained by weighing it. . . .

"Q. You never went over to the L. & N. to get them to issue a bill of lading or any other evidence of ownership of this car, did you? A. No, sir."

This witness said it was not always a matter of indifference to the respondents about the shipping directions they received from a purchaser, because directions might be given that would delay the movement and weighing of the grain, thereby delaying their collection of the purchase price. He said that usually the weights were taken from scales in St. Louis or from the elevator in East St. Louis, that the weight of this load of grain was to be ascertained at the Columbia Elevator, that it was to be paid for immediately after ascertaining its weight and that ordinarily they got the weight of a shipment from the elevator before it reached a railway in East St. Louis. Vincent further testified as follows:

"Q. That corn had been sent, ordered sent to the account of the Woodson-Young Grain Company, had it not? A. Yes, sir.

"Q. Would not the Woodson-Young Grain Company be the only person that the road would recognize

as owning that corn if it was shipped to them? A. Well, the railroad in that case would generally recognize either party that makes demand for it; that is, if they held such a receipt as we did.''

The meaning of this answer is that the railroad company, over whose line the car was to be shipped, would recognize either the seller or the purchaser and issue a bill of lading to either; would issue to the seller by virtue of the retention by him of a copy of such an order as was given to the ''K'' Line by respondents, of which order a copy was retained by the respondents in this instance. The agent of the Burlington Road, with which, as stated, the ''K'' Line is connected, testified to receiving the order from respondents for the transfer of the car to the Louisville & Nashville Railway, via the Wiggins Ferry Company, and testified further as follows:

''Q. And what was done with the car then upon receipt of this order? A. It was marked off and switched to the Wiggins Ferry Company for the Columbia Elevator to be delivered to the L. & N.

''Q. To whom was it billed? A. Woodson-Young Grain Company.

''Q. Did you receive many such orders as this? A. Oh, yes, sir.

''Q. What is the understanding from that order; what is the meaning of such an order as that to a railroad man? A. That means the car is to be delivered to the Woodson-Young Grain Company at the L. & N. railroad, to be transferred at the Columbia elevator.''

GOODE, J. (after stating the facts).—The facts of the case are related without any material discrepancy by the different witnesses, and the question is as to the ownership of the corn under the law when it was sold and the proceeds appropriated by the respondents. If the judgment in their favor was based on the belief that the appellant did not discount the draft of the

Woodson-Young Grain Company and accept the assignment of the bill of lading in good faith and in the ordinary course of business, we find no evidence in the record to sustain such a conclusion. Nothing appears to impugn the bank's motive in paying the draft on the faith of the bill of lading, and if the judgment is to stand some other basis for it must be found. In truth the contention that bad faith tainted the purchase of the draft was not preferred in this court. The defense relied on is that there had been no delivery of the corn to the grain company and, therefore, the title to it had not passed from the respondents and the action of Edward Young in diverting it to the Illinois Central Railway Company's tracks and procuring a bill of lading from that company was unlawful if not larcenous. In other words, the car of corn still belonged to the respondents and the grain company could transfer no title to the bank either by an outright sale and delivery of the corn itself, or by the assignment of the bill of lading. No doubt one individual can not take possession of personal property belonging to another and pass the title as against the owner by a sale, even if the purchaser buys in good faith. This is always true unless the owner was guilty of laches or acts which made the fraudulent sale possible. In that contingency the law raises an estoppel against him to prevent his careless conduct from resulting in loss to an innocent purchaser. This case should be considered then, first, with reference to the legal nature of the transaction between Young and Vincent regarding the corn. Did that transaction amount to a sale by which the title to the corn passed to the grain company; or was it only an executory contract of sale contemplating a future delivery and transfer of title when the corn reached the Louisville & Nashville Railway Company? The latter is the position taken by the respondents. They contend it was a cash sale and that no title was intended to or did pass until payment was made; or, at least, until the corn was de-

livered; and that it could be delivered nowhere else than at the designated place, namely; the Louisville & Nashville Railway Company's tracks in East St. Louis. This argument presents the defense of respondents' ownership of the corn when the bill of lading was negotiated by the grain company to the bank, as hinging on two circumstances; that the price was to be paid when the weight of the corn was ascertained and that it was to be delivered, as the respondents say, to the Louisville & Nashville Railroad Company. Unless one or both of those circumstances sufficed to retain the ownership in the respondents, it had passed to the grain company before the bill of lading was issued by the Illinois Central Railway Company, and passed to the bank when the bill was negotiated. The corn was to be paid for as soon as its quantity was ascertained at the elevator and made known to the respondents, but the sale was not conditioned on immediate payment, though in the parlance of trade it may have been called a "cash sale." The contract of sale contemplated a delay of several days in payment; and, in fact, though the contract was made on August 23, the corn was not weighed until the twenty-seventh, and the weights were not ascertained by the respondents until the twenty-ninth. Under such an arrangement the respondents could have retained the title to and the possession of the corn very easily, not only as against the grain company, but as against an innocent purchaser of a bill of lading fraudulently procured by the grain company, by keeping it in their own or their agent's charge. Instead of doing this they surrendered the bill of lading previously issued to them by the Chicago, Burlington & Quincy Railroad Company, which was their muniment of title, and gave an order to the agent of that company to send the corn to the Louisville & Nashville tracks in East St. Louis by the Wiggins Ferry via the Columbia elevator. The order directed, too, that it should be transferred "for the account of the Woodson-Young Grain Company."

Neither the "K" Line, the Wiggins Ferry Company, nor the Columbia Elevator Company was directed to act as agent for the respondents for the collection of the price of the corn, nor was either to hold it until the price was paid. The order given by the respondents authorized the "K" Line to deliver the grain to intermediate parties, the Wiggins Ferry Company and the Columbia Elevator Company, as agents of the vendee, the Woodson-Young Grain Company, and not as respondents' agents. The rule is universal, we believe, that the delivery of goods to a common carrier for transportation to the vendee in accordance with his instructions, is a delivery to the carrier as the vendee's agent and equivalent to a delivery to the vendee himself. See Tiedeman, Sales, sec. 97; Benjamin, Sales, sec. 182 and numerous citations in the notes; Scharff v. Meyer, 133 Mo. l. c. 444; Gill & Fisher v. Com. Co., 84 Mo. App. 456. No fact from which an intention on the part of the respondents to reserve the title or custody of the corn until it was paid for by the grain company, or until it reached the Louisville & Nashville tracks, is in evidence. It was shipped in strict accordance with the directions of Young and the respondents parted not only with possession of the grain itself, but with their evidence of title, the bill of lading they held.

It is insisted that a place of delivery was designated (the L. & N. tracks) and, therefore, no delivery to the grain company occurred because the corn never reached those tracks. The evidence refutes this notion; for it discloses that though the corn was to be *sent* to the Louisville & Nashville Railway in East St. Louis, as the respondents' order to the agent of the "K" Line said, there is nothing to show it was to be *delivered* to the Woodson-Young Grain Company, or to the Louisville & Nashville Railway Company for the grain company at those tracks. It was to be sent there because the grain company intended to ship it to Nashville over that line; but neither those tracks nor any other spot was desig-

nated as the place of delivery. Vincent testified that
the shipping direction or routing was given at Young's
request; not because the respondents stipulated for de-
livery at that place, or sought to protect themselves as
to payment for the corn by having it delivered there,
or reserved the title until it was delivered there. Re-
spondents' defense rests mainly on the bare fact that
though their order to Elting was to send the corn to the
Louisville & Nashville tracks, it did not reach there, but
was diverted by Young from the Columbia Elevator to
the Illinois Central tracks. Therefore, they say it never
was delivered and the title never passed. This is basing
the defense on an immaterial incident. It may readily
be granted that if the contract between the respondents
and Young had contained a stipulation as to title passing
or delivery taking place at the Louisville & Nashville
tracks, that stipulation would have been an essential ele-
ment of the sale and would have protected the respond-
ents by keeping the title in them until complied with;
would have protected them unless they broke down the
protection by acts sufficient to create an estoppel. But
there is an essential difference between stipulating for
the delivery of a purchased article to the vendee at a
certain point and observing a request to send it to that
point by an intermediate common carrier. Looking
squarely at the facts, no inference is possible except
that there was an outright sale of this corn on the floor
of the Merchant's Exchange, which, if it did not become
effective then and there, became effective when the corn
was turned over to the first carrier, the Wiggins Ferry
Company. The title then passed to the Woodson-Young
Grain Company and they could transfer it to an inno-
cent purchaser by delivering the corn itself or assigning
a bill of lading issued for it by a common carrier. R. S.
1899, sec. 5054; The Brunswick Co. v. Martin Co., 20
Mo. App. 158; Hall & Robinson v. Railroad, 50 Mo. App.
179, 184; Johnson-Brinkman Co. v. Bank, 116 Mo. 558.

It is to be borne in mind that the respondents sold

a separate and distinct article, already separated from other property of the respondents. It did not need to be selected and set apart. Hence, nothing remained to be done to consummate a present sale; for the fact that the corn had to be weighed to find the total price did not postpone the transfer of the title or render the sale executory. Cunningham v. Ashbrook, 20 Mo. 553; Southwestern Co. v. Stanard, 44 Mo. 71; Ober v. Carson's Excr., 62 Mo. 209; Glass v. Blazer Bros., 91 Mo. App. 564. There being no facts in proof to show an intention to transfer the property in the corn later, the transaction presents the elements of a present sale. Lingham v. Eggelston, 27 Mich. 329.

It is not necessary for us to determine whether or not the title to the corn had so far passed from the respondents that they could not have reclaimed it as against the Woodson-Young Grain Company or attaching creditors. What we decide is that the title had vested in the latter company so as to enable it to transfer the property to an innocent purchaser, and that a transfer to such a purchaser took place when appellant discounted the draft on J. H. Wilkes and Company in reliance on the bill of lading.

The same result we have reached by attending to the question of the ownership of the corn when the bill of lading was assigned, might likewise be reached on the ground that the respondents were estopped to claim the corn against the appellant by having made it possible for the Woodson-Young Grain Company to deal with it as an apparent owner. Depew v. Robards, 17 Mo. 580; Johnson-Brinkman Co. v. Bank, supra; Young v. Bradley, 68 Ill. 553.

Certain decisions are cited by respondents' counsel in support of their position. One of these is the Stanard case, which we hold is favorable to the claim of the bank. In that case Stanard prevailed against the holder of a bill of lading which had been negotiated by a vendee to whom Stanard had sold the commodity on

which it was issued, because Stanard never had parted with the possession of the commodity; but, on the contrary, had refused to surrender possession. The bill of lading was procured by the vendee without the commodity having passed out of Stanard's custody. In Hall & Robinson v. Mo. Pac. Railroad, plaintiffs had sold corn for cash and received in payment a check which was dishonored. They were allowed to recover the corn from the railroad company, which had issued bills of lading to them. These bills had been assigned by the plaintiffs to Theodore Nathan. The railway company contended that the corn had been attached by creditors of Nathan. In fact it had not been, but was still in Nathan's hands by virtue of the bills of lading assigned to him by the plaintiffs. As he had failed to pay for the corn on delivery and the contract of sale provided he should, the plaintiffs obtained judgment for it; but the opinion carefully guards against the inference that the plaintiffs could have recovered if a cash payment had been waived, or the corn had passed into the hands of an innocent purchaser, or the bills of lading had been negotiated by Nathan. The decision in Alabama Nat'l Bank v. Railroad, 42 Mo. App. 284, was that an actual sale and delivery of goods by their owner who held a bill of lading on them from the railway company, transferred the title as against a subsequent innocent indorsee of the bill. That was the case of two equally innocent buyers of property and the right of the one who bought first prevailed. In Brunswick Co. v. Martin Co., supra, the plaintiff, as vendor, succeeded in reclaiming property sold for cash, from the defendants who claimed as purchasers from the vendee, because the plaintiff had retained the property in itself, either by taking a bill of lading when the goods were shipped in its own name and then indorsing the bill to its agents at destination, or by consigning the goods directly to the agents. Whichever mode was adopted, it is clear the agents were to collect the purchase money before

the title passed or delivery was made to the vendee. The latter took possession of the goods surreptitiously and mortgaged them to the defendants.

The point decided in many cases and the principles declared in all of them are consistent with appellant's ownership of the corn as assignee of the bill of lading.

The judgment is reversed and the cause remanded. *Bland, P. J.*, and *Reyburn, J.*, concur.