J. D. CLARK, RESPONDENT, v. CROWN DRUG COMPANY, A CORPORATION, and CROWN DRUG STORES, INC., A CORPORATION, APPELLANTS.—146 S. W. (2d) 98.

Springfield Court of Appeals.   December 14, 1940.

Rehearing Denied December 31, 1940.

*Schwimmer, Keating, Bredehoft & Burris* and *A. P. Stone, Jr.* for appellants.

*W. Harold Randall* and *A. B. Lovan* for respondent.

208

■■■■■■■■■■■■■■■■
■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■

TATLOW, P. J.—The parties will be referred to in this opinion as plaintiff and defendants.

The learned trial judge rendered a memorandum opinion in which he stated the issues and found the facts, which we approve, as follows:

"Plaintiffs in this case seek to enjoin the defendant from so conducting its business, that is making illegal sales of liquor, so as to create unfair and illegal competition against the plaintiffs; plaintiff suing for himself and practically all of the other tap room operators in the City of Springfield.

"The evidence shows that the defendant has sold liquor on telephone orders and that the title to the property sold did not pass until the liquor was delivered to the purchaser at the purchaser's home or at a place other than defendant's store. This is established by the testimony of defendant's manager. Defendant's manager testified that in cases where liquor has been ordered over the telephone, to be delivered to the purchaser not at defendant's store, the instructions to the messenger or agent of the defendant who delivered the liquor, were not to deliver it unless paid for. This to the Court's mind was a passing of the title, in other words, a sale at a place other than defendant's store and in contravention of the law. Nor could the legal effect of this fact established by the manager's testimony be destroyed or circumvented by the written agreement between the purchaser and the defendant that the sale should be considered as having taken place at the store. As the Court views it, that would be an attempt to circumvent the fact and the plain law as based on the fact that the title to the liquor was to pass at the place of delivery, for the defendant now to say that he and his customers had agreed that a different interpretation should be given to the transaction."

We adopt the finding of the trial court, and also make the following additional findings of fact.

The suit was filed on the 12th day of August, 1939; from February 20, 1940, to April 20, 1940, the defendants adopted the method of requiring each purchaser of liquor, ordered over the telephone, to agree as follows:

"May we at this time consider the sale of the intoxicating beverage

just ordered as a completed transaction and that delivery of this product is not a condition precedent to the completed sale?

"Are you 21 years of age or older?"

A customer ordering liquor over the telephone was required to give affirmative answers to the above questions, and, when the delivery was made, defendants' employee who was making the delivery, would have the purchaser sign a slip containing the above questions, which slip was then returned to the defendants.

The slip also contained the following: "I hereby certify that, when this intoxicating beverage was purchased, I asked the purchaser the two questions printed above, and that I received affirmative answers to both questions."

This was signed by the employee receiving the order over the telephone.

Defendants' evidence developed the fact that the plaintiff was unable to give the names or addresses of his customers; and that there was no testimony to indicate that any one who purchased liquor from plaintiff's tap room ever purchased any liquor from the defendants' drug store, either over the telephone or otherwise. Nor was there any evidence to the effect that if a person had been unable to purchase liquor from the Crown Drug Store, over the telephone, such person would have gone to plaintiff's tap room, some seven blocks away, and purchased the liquor there. In other words, there was no direct evidence that the plaintiff ever lost any customers or the sale of liquor by reason of the fact that the defendants were selling such intoxicating beverages over the telephone. The defendants offered considerable evidence to develop and support this contention. Neither was there any direct evidence that any of the tap rooms not selling intoxicating beverages over the telephone lost the sale of any such beverages by reason of the fact that the defendants were selling liquor on telephone orders. Defendants' manager testified: "The amount of liquor sold and delivered daily varies a lot. I would say that we sell and deliver between $5.00 and $7.00 worth of liquor a day.".

The section of the statute relating to this matter (Sec. 5, Laws of Missouri, Extra Session, 1933-1934, p. 80), is as follows: "No person, agent or employee of any person in any capacity shall sell intoxicating liquor in any other place than that designated in the license, or at any other time or otherwise than is authorized by this act and the regulations herein provided for."

It is alleged in the petition and admitted in the answer that the defendants were licensed to sell intoxicating beverages at their place of business at the northeast corner of St. Louis and Jefferson Streets, in Springfield, Missouri, in the original packages. It is also alleged in the petition and shown by the evidence that plaintiff was licensed to sell liquor by the drink and in bottles, half pints and quarts, at his place of business in the City of Springfield.

The first question for decision is whether the sale of liquor on orders over the telephone, and the subsequent delivery thereof, and the collection of the purchase price at the time and place of the delivery, is a violation of Section 5, supra. The Missouri decisions dealing with this question are: State v. Young, 70 Mo. App. 52; State v. Houts, 36 Mo. App. 265; State v. Wingfield, 115 Mo. 428, 22 S. W. 363; Canton v. McDaniel, 188 Mo. 207, 86 S. W. 1092; State v. Rosenberger, 212 Mo. 648, 111 S. W. 509; State v. Swift & Co., 273 Mo. 462, 200 S. W. 1066.

The case of State v. Young, supra, is very short and directly in point. It is there said: "Defendant was indicted, tried and convicted for selling intoxicating liquor in less quantities than three gallons without a license. The facts were these: Defendant was a licensed saloon keeper and having closed his saloon between 7 and 8 o'clock for the evening, was walking down the street, and at a point half a block away, in front of a livery barn, he met some parties, one of whom wanted a quart of whisky; asking defendant why his saloon was not open, defendant told him he would get the whisky for him and for him to go into the barn and wait. He waited in the barn a few moments when defendant returned with a quart bottle of whisky and delivered it to him, receiving from him $1 in payment.

"We must hold the defendant properly convicted. The sale was not at, or in, the licensed place. He perhaps did not intend to violate the law and may have thought his license protected him, but the fact remains that he sold and delivered the liquor at a place where he had no license to sell."

This meets with our approval unless it is inferentially overruled by the decisions of our Supreme Court in the cases cited supra; we do not think that it has been overruled.

The case of State v. Wingfield, supra, was one in which the defendant was indicted and convicted for selling beer in the City of Fayette, in violation of the "local option law." The court said: "The evidence for the state shows the following state of facts: The witnesses had gone to defendant's place of business for beer, but were informed by him that he could not let them have it, but he told them they could order it from Wm. J. Lemp of St. Louis. He gave witnesses blank orders which they filled out with the number of cases or kegs they wished, signed them and gave them to defendant to send off for them. These orders were addressed to W. J. Lemp & Co., St. Louis, directing the company to send them the number of cases or kegs they wished, to the care of defendant. The beer was shipped by Lemp from St. Louis, as directed in the orders to defendant in his name and stored by him in his warehouse, and afterwards delivered to the parties ordering it as they called for it, sometimes only a portion of it being called for at a time, as it was delivered; whether the whole amount ordered was taken away at one time or not, the portion that was delivered was paid for at the time."

The court in that case gave the following instruction: "If the jury find from the evidence that the defendant . . . received within the limits of the city of Fayette, Howard county, Missouri, orders for beer to be delivered in Fayette, and that he forwarded the same to St. Louis, and that beer was sent to defendant at Fayette, under said orders so taken and forwarded by him, and that he received said beer and delivered the same within said city to the parties from whom he had taken said orders, and collected the money for said beer from said parties, within said city, for himself or for W. J. Lemp, then the jury are instructed that they must find the defendant guilty . . ."

The Supreme Court held that the giving of that instruction was error, for this reason: "The general rule is that where the goods have been delivered to a common carrier for transportation to the purchaser, the delivery to the common carrier passes the title. (Citing cases.) And this seems to be the law, although the purchase money is afterwards collected by the vendor or agent at the place from which the goods were ordered. . . .

"A different rule prevails where the purchase money does not accompany the order and by direction of the vendor the goods are not to be delivered until the purchase money is paid. In such case the sale is not complete until the conditions are complied with, and this would be at the point of destination of the goods shipped. . . ."

In the above case the reason given by the court for holding that the sale was made in St. Louis and not in the City of Fayette, was that the goods were ordered and delivered to a *common carrier*, which constituted a delivery to the purchaser at the place of delivery to the common carrier.

There is no common carrier involved in the instant case, and, so far as we can see, the case has no application here. It does not overrule State v. Young, supra, but cites, and follows, an earlier case of the St. Louis Court of Appeals, which, it seems to us, is in line with the Young case. "The case of State v. Houts, 36 Mo. App. 265, is not in conflict with the views herein expressed. In the case the evidence showed that the defendant was in the employ of a St. Louis brewery engaged in running a 'beer car' along the line of railroad through Scott county; that a few days prior to the delivery of the beer in that county defendant had met the witness in another county, and he gave the defendant an order for one keg of beer, which was afterwards delivered to the witness in Scott county, when he paid defendant for it, and the court very properly held that it was a sale of the beer in Scott county, and that defendant was guilty of violating the law." [115 Mo. l. c. 438, 22 S. W. l. c. 366.]

We can see no material difference between the Young case and the Houts case; the facts are substantially the same. If the court very properly held, in the Houts case, that it was a sale of beer in Scott County, it also very properly held, in the Young case, that the sale

was not at defendant's place of business and was in violation of his license.

In the case of State v. Rosenberger, supra, the court says: "The evidence tended to prove that the defendant was a wholesale and retail liquor dealer, with office and place of business in Kansas City, Jackson county, Missouri, and did business under the trade name of 'Penwood Company.' Ira Morton, a resident of Marshfield, in Webster county, Missouri, some time in January, 1907, ordered a gallon of whiskey from said Penwood Company, and on February 2, 1907, the whiskey was received by him from the agent of the Wells-Fargo Express Company, at the office of said company in Marshfield. The whiskey was sent in a package marked C. O. D., and Morton paid said express agent the price thereof, $3.50, at the time of delivery, and the express agent sent the money to defendant's office at Kansas City, where it was received. Morton testified that he mailed the order to defendant of his own motion, without any solicitation on the part of defendant, or any one on his behalf, and solely because he wanted the liquor for his own use. The express company received the package containing the whiskey from one of defendant's employees at Kansas City, and shipped the same to Morton, at Marshfield. . . ."

On this state of facts the Supreme Court en banc, speaking through Judge Burgess (who also rendered the opinion in the Wingfield case), held that the sale was made in Kansas City and not in Marshfield. Judge Burgess cited a long list of cases to the contrary, as well as a long list of cases, which he considered better reasoned, sustaining his conclusion. He further says: "What was said by this court upon this question in State v. Wingfield, supra, and in Canton v. McDaniel, supra, was unnecessary to a decision of either of those cases, because the shipments were not C. O. D., and therefore what was said respecting such shipments in those cases may properly be regarded as obiter; . . ."

In other words he overruled the obiter with reference to the fact that the C. O. D. shipment prevented the delivery to the common carrier being, in law, a delivery to the purchaser. Neither of those cases has any application to the case at bar for the reason that no common carrier is involved. In the instant case there was no delivery to a common carrier—which was the dominating and controlling principle in both of those cases. If either the Young case or the Houts case has been overruled by inference it is by the case of State v. Swift & Co., 273 Mo. 462, 200 S. W. 1066, supra. With reference to the evidence in that case, the court says: "The evidence shows that the defendant Swift & Company had what is called a 'plant' in East St. Louis, Illinois, and that the defendant Hunter was manager of the business of that corporation at that place. Stocker Brothers was a corporation engaged in the grocery business in the city of St. Louis, Missouri. On October 4, 1915, someone representing Stocker Brothers

in St. Louis called Swift & Company in East St. Louis on the telephone and ordered a hundred and fifty pounds of colored Lincoln oleo. That amount of that commodity, being five thirty-pound cases, was then separated from the general stock, loaded into a wagon belonging to Swift & Company, hauled to Stocker Brothers' store in St. Louis, Missouri, and there delivered; the price for the same was charged to Stocker Brothers by Swift & Company and the bill was paid November 26, 1915.

"There is no dispute that this commodity was of a character condemned by the statute. . . ."

Observe that the defendant in that case was not indicated for making a *sale*. The statute applicable there prohibited the defendant from keeping on hand for the purpose of sale, in Missouri, a commodity composed of animal fat, etc., and colored in imitation of butter, and also prohibited the sale of such commodity in this State; but the defendant was not indicted for selling the commodity. The court held that the case differed from the case of State v. Rosenberger, *supra*; but that the sale was made in Illinois and not in Missouri, because: ". . . After they were separated and segregated by placing them in the wagon for the purpose of delivery it would look as if the contract of sale was complete at that time, and title passed, as would have been the case if Swift & Company had had only five cases of oleomargarine and Stocker Brothers had been in the store at the time, designated the five cases, and agreed upon the terms of purchase.

"It seems to make no difference that the goods were not paid for at the time, but charged to the purchaser's account. It is held usually that where a contract of sale is made for a specific article to be charged for and where there is nothing more to do except to deliver it and collect the price, the contract of sale is complete without delivery and without payment. . . ."

If, in the instant case, instead of ordering the liquor over the telephone, the purchaser had called at defendants' store, purchased a bottle of liquor, had it separated and set apart from the rest of the stock, and had paid for it, its subsequent delivery by defendants to the purchaser's residence would not have prevented the sale from having been consummated at defendants' place of business. It is true that the opinion in the Swift & Co. case goes further and says that it would have constituted a sale even if Stocker Brothers had not paid for the oleomargarine but had merely agreed to do so. However, no such state of facts was before the court. Observe also that the question of sale was not involved in that case; the sole and only question was, did Swift & Co. have the property in its possession in Missouri for the purpose of sale? This is clearly shown by the reasoning of the court, as follows: ". . . Here was a binding contract entered into between these parties whereby the owner agreed to sell and deliver certain goods to the purchaser. The goods were separated from the

general stock for the purpose of such delivery; they were placed in a wagon and taken to St. Louis in pursuance of that purpose, and delivered there. *By what stretch of construction could it be said that Swift & Company kept those goods on hand for even an instant of time for the purpose of sale in St. Louis?* (Italics ours.) Stocker Brothers undoubtedly kept oleomargarine for sale and sold it in St. Louis, but whether there was a proceeding against them does not appear.''

It is further said in that case: ''. . . A contract of sale may be fully executed so that title passes, or it merely may be executory. [Cunningham v. Ashbrook, 20 Mo. 553; Bank v. Smith, 107 Mo. App. 178.] In general, the acceptance of an order by the person on whom the order is made is a binding agreement between the parties, although there is no completely executed contract of sale. As said in the case of Cunningham v. Ashbrook, 20 Mo. 1. c. 556: '' 'The term sale, however, in its largest sense, may include every agreement for the transferring of ownership, whether immediate or to be completed afterwards, and goods, in reference to the disposition of them by sale, may be considered as existing separately and ready for immediate delivery, or as a part of a larger mass from which they must be separated by counting, weighing, or measuring, or as goods to be hereafter procured and supplied to the buyer, or to be manufactured for his use.' ''

The opinion concludes as follows: ''. . . Statutes usually are to be construed so as to give effect to the ordinary meaning of words. [State ex rel. v. Gordon, 266 Mo. 1. c. 411.] There is no reason why a strained construction should be given the statute with which we have to deal, so as to convict the defendants, because the common understanding of the meaning of the language used seems to accord with the evident purpose of the law.''

In that case, it seems to us that an executory agreement to sell would have prevented defendants' mere subsequent possession of the property in Missouri for the purpose of carrying out such agreement, from bringing him within the statute prohibiting the keeping of such property in Missouri for the purpose of sale. The reasoning of the court would perhaps indicate that, if defendant had been indicted for selling the goods he would not, under the facts there stated, have been subject to conviction for selling the goods in Missouri. However, the fact still remains that the question of whether there was a sale contrary to the statute was not involved, and what is said by the court with reference to its constituting a completed sale in Illinois, is *obiter*, for the identical reason stated by the court in the Rosenberger case, with reference to the court's observation in the Wingfield case, concerning C. O. D. shipments which were not involved. Hence, it is our conclusion that none of the cases *supra* overrule, by inference, either the Young case or the Houts case, which cases, it seems to us, are directly in point.

We do not agree with either the trial court or counsel for the defense that the intention of the parties is controlling. Concerning this, the trial court says: ''The Court agrees with the defendant that the intention of the parties is controlling as to when title passes, but the intention of the parties, as established by the fact, cannot be altered by declarations or agreement between the parties that their intention is other than what the law makes it on the uncontested facts.''

In our opinion, it is the intention of the Legislature, as expressed in the statute, and not the intention of the parties, that controls. In our opinion the Legislature intended, by this statute, that the sale, of which the *delivery* constituted an essential part, was permitted to be made *only* at defendants' place of business, as designated in defendants' license. It seems to us that this construction gives effect to the ordinary meaning of the word ''sale,'' as there used, and that such common under standing of the meaning of the word as used in the section accords with the evident purpose of the statute. This is especially true where, as in the instant case, the word is used in connection with an attempt to regulate a commodity, the possession or sale of which the Legislature, if it so desires, has the power to prohibit. The mere privilege to sell the same must be construed in accordance with the evident intent of the Legislature.

We might cite numerous provisions in the statute setting up a complicated system of regulation and supervision of intoxicating liquors, that clearly indicate to us that the place designated in the license is the crux of the section *supra* of the statute.

The mere fact that such a sale violates the statute is not, of itself, sufficient to entitle plaintiff to an injunction; he must show that some property right of his has been destroyed or damaged by such illegal sale. The Supreme Court of the United States has dealt with this question in several recent cases. [Frost v. Corporation Commission, 278 U. S. 515, l. c. 520, 49 S. Ct. 235, 73 L. Ed. 483, l. c. 487; Corporation Commission v. Lowe, 281 U. S. 431, 438, 50 S. Ct. 397, 74 L. Ed. 945, 950; New State Ice Co. v. Liebmann, 285 U. S. 262, 311, 52 S. Ct. 371, 76 L. Ed. 747, 771; Alabama Power Co. v. Ickes, 302 U. S. 464, l. c. 484, 485, 58 S. Ct. 300, 82 L. Ed. 374, l. c. 381.] In the Frost case supra, the court says: ''It follows that the right to operate a gin and to collect tolls therefor, as provided by the Oklahomá statute, is not a mere license, but a franchise, granted by the State in consideration of the performance of a public service; and as such it constitutes a property right within the protection of the 14th Amendment. . . .''

This would seem to recognize a distinction between a franchise and a mere license. In order to bring such a right within the protection of the 14th Amendment, it is necessary that the complaining party have either an express or implied contract giving him a monopoly in the sale of such property or commodity.

The Lowe case, *supra*, is to the same effect. The Ice Company case, *supra*, draws a plain distinction between a commodity (such as intoxicating liquor), the possession or sale of which the Legislature has the absolute power to prohibit, and a commodity, the right to the possession and sale of which is inherent, and to which no public interest attaches so as to authorize the Legislature to regulate its sale. The Alabama case, *supra*, says, with reference to this question: . . . The difference between the Frost Case and this is fundamental; for the competition contemplated there was unlawful while that of the municipalities contemplated here is entirely lawful.''

In other words, that case holds that if the sale is *unlawful*, and if such unlawful competition in fact damages the plaintiff's business, then plaintiff has been specially damaged by such sale; he stands, in relation to such sale, in an entirely different position from the public in general.

The plaintiff has cited several cases from other states where, under very similar facts, injunctions were denied for the reason that plaintiffs in those cases did not offer proof to show they had sustained special damages. It should be observed that these cases recognize the right of a plaintiff to enjoin such unlawful competition if such plaintiff could make the required proof. It should also be observed that the court was dealing with those cases from the viewpoint of special damages to the individual claimant. In Wollitzer v. National Title Guaranty Co., 266 N. Y. S. 184, the plaintiff, a licensed attorney, sought to enjoin defendant from the alleged unlawful practice of law. The complaint set forth no special damages, the only allegation being that plaintiff's practice had greatly suffered. In Smith v. Lockwood, 13 Barb. 209, l. c. 220, the allegations were ''that their wages were lowered because saws that were manufactured in the state prison at Sing Sing came in competition with the saws that they manufactured.'' Corchine v. Henderson (Tex. Civ. App.), 70 S. W. (2d) 766, is a case in which the plaintiffs, who were dealers in automobiles and automobile parts, sought to enjoin defendant from keeping his place of business open on Sunday, in violation of a statute. This is the only case that would seem to proceed upon the theory of a class suit.

It might well be true that, in the instant case, the evidence is insufficient to show that plaintiff has, in fact, suffered any actual damages, or that he would hereafter suffer any actual damages on account of defendants' sale of intoxicating liquor over the telephone. We are inclined to think that the evidence is insufficient to establish such loss. Moreover, we do not think the Legislature had in mind the protection of plaintiff's business from competition; clearly the act is a police regulation seeking to stringently regulate all those to whom licenses are granted for the sale of intoxicating liquors. Whether or not the act has accomplished its purpose is not for us to say. Under the authorities *supra*, especially the decisions of the Supreme Court of

the United States, it would seem that, as a class, those who have procured licenses are entitled to protection from such unlawful sales. Although the statute was passed, not for their protection, but for an entirely different purpose, nevertheless, sales in violation of the statute would, necessarily to some extent, deprive them of sales they would otherwise make. The extent to which they would be so deprived cannot be ascertained with any degree of certainty. In other words, common law actions for damages could not be maintained successfully because they could not prove with a sufficient degree of accuracy the amount of damages they would suffer. It seems to us that there can be no escape from the conclusion that, to permit the defendants to continue making such unlawful sales, would cause the class to which plaintiff belongs to suffer some loss of business—how much no one knows, and it is not susceptible of proof; but, under the Missouri decisions, this fact alone would not seem to prevent the granting of an injunction against the continuation of such unlawful sales. [Carson v. Sullivan, 284 Mo. 353, 223 S. W. 571.] In this case our Supreme Court, *en banc*, at the instance of a taxpayer suing for himself and all other taxpayers of the State, affirmed a decree granting an injunction against the submission to the voters of the question whether the 18th Amendment to the Constitution of the United States, prohibiting the manufacture, sale and transportation of intoxicating liquors, should be ratified. His right to maintain the suit was based upon the fact that he was a taxpaying citizen of the State and had a right to prevent the unlawful expenditure of public funds. This case was followed by the court, *en banc*, in Hawkins v. City of St. Joseph, 281 S. W. 420. The property rights and damages sustained by the taxpayers in those cases were certainly as doubtful and uncertain of computation as are the damages to plaintiff in the instant case.

Under those cases we feel constrained, though with some hesitation, to hold that plaintiff, on behalf of himself and the others of his class, is entitled to enjoin the unlawful sales which the defendants in this case seek to continue to make but for the injunction.

The decree of the trial court is, therefore, affirmed. *Fulbright, J.,* concurs; *Smith, J.,* concurs in result.

ON MOTION FOR REHEARING.

SMITH, J. (Dissenting)—This case was argued and submitted, and an opinion prepared by TATLOW, P. J., in which I concurred.

A motion for rehearing was filed, and on further consideration of the case, I have come to the conclusion that the opinion heretofore handed down in this case, and in which I concurred in the results, is in conflict with the ruling of the Supreme Court dealing with the question involved in the case.

I, therefore, withdraw my concurrence in the majority opinion, and wish to be marked as dissenting in the results therein reached. I also dissent from the order overruling the motion for rehearing. The opinion, in my judgment, and the overruling of the motion for rehearing are in conflict with the case of State ex rel. Crow, Attorney General, Appellant, v. Dennis Canty et al., 207 Mo. 439, 105 S. W. 1078.

It is my judgment that there is nothing in the evidence in this case to show that a public nuisance existed, sufficiently to require the action of a court of equity to act by injunction proceedings. The act of the appellants in delivering and collecting for the delivery of the liquor in this instance was a violation of the criminal laws of this State, and for the enforcement of which laws, we have penal statutes, and enforcement officers. It is my opinion that the enforcement of penal statutes should be pursued by enforcement officers and not by courts of equity.

I therefore respectfully dissent from the majority opinion heretofore rendered in this cause, and dissent from the order overruling the motion for rehearing and ask that the cause be certified to the Supreme Court, because I believe the opinion and the order of court on the motion for rehearing to be in conflict with the case above mentioned.